Good morning and may it please the Court, Jeffrey Ehrlich for the Appellant. This is an appeal from a summary judgment in a negligence case. And there are two issues in general, broad issues that the Court must deal with. The first is whether NASCO owed a duty of care to Mr. Thompson with respect to the construction of the scaffold. And if such a duty did exist, then the second question is whether NASCO succeeded in its summary judgment motion of establishing as a matter of law that there was no breach of that duty. I'll turn first to the duty question, which I think is really quite clear. The District Court granted summary judgment for NASCO based on its finding that the purvet and doctrine, purvet and its progeny, protected NASCO from any liability for Mr. Thompson. And the Court acknowledged that the Supreme Court's decision in McCown held that a party who provides defective equipment to the independent contractor it hires owes a duty of care to the employees of the independent contractor. But the Court held that McCown dealt with equipment only and that it would somehow be improper to extend it to scaffolding, because scaffoldings are structures. Now, I think I could probably persuade this panel that, based solely on the reading of McCown and the logic of that decision, that that is not a defensible position. But I don't think that the question is really open for debate any longer, because the Supreme Court in Elsner v. Juvegis answered the question, and it applied the rule from McCown to a defective scaffold. It's flat out said in Elsner that the contractor that built the scaffold owed a common law duty of care. So I think that that issue is foreclosed. There was a duty of care, and really the only question left then is, was there a tribal issue of fact on this record with respect to whether NASCO breached the duty? And that's what I'll address next. I think it's pretty clear that there are numerous tribal issues of fact and breach, and that you can get there in several ways. The first tribal issue of fact relates to the materials that NASCO chose to use to build the scaffold, to connect the mid-rail that fell to the frame of the scaffold, to the uprights, a polyester strapping material called packstrap. And the testimony is very clear that packstrap was sold and designed as a strapping material for shipping. It's not a construction material. That it stretches up to 12% when it's pushed on, and it doesn't return to its original shape. That's a terrible material for attaching a mid-rail guardrail to a scaffold, because if there's any stress, the packstrap is going to loosen and it's not going to tighten back up. And now you have a loosely tied guardrail, which appears to be exactly what happened here. Now NASCO, in its summary judgment motion, argued that, and this is a quote from its motion, that packstrap is commonly used in the marine industry, and does not come with a warning that it should not be used to build scaffolds. Now, that is true, but I think you could say the same thing about fishing line. It's used in the marine industry, and it doesn't come with a warning that you shouldn't use it to build scaffolds. That doesn't mean it's a suitable material. There was no expert testimony submitted by NASCO that said that it's appropriate to use packstrap to attach uprights, I'm sorry, the mid-rail or guardrail to an upright. And Thompson, in his opposition, did submit expert testimony from a qualified safety engineer, Morris Forkless, who has 35 years of experience in safety engineering, has been an expert in over 200 cases, including 25 where the issue was the safety of a guardrail. But the district judge struck part of his testimony. That is correct. If the district judge was right, does that end your case? No, it doesn't. Why not? Well, first of all, I don't even think you need expert testimony at all based on the material. I think the jury could find, just based on the testimony of that packstrap itself has these properties of stretching and not returning back as improper. Second of all, and this gets to another issue, but there was undisputed testimony that the standards of care and the safety manuals from NASCO itself and also other engineering organizations said that scaffold uprights shouldn't be more than eight feet apart. And the ones here were ten feet apart. So that's a completely different issue that has nothing to do with the packstrap itself. We have also the doctrine of restive soloquitur where, you know, in 1917, the California Supreme Court in Nolan v. Engstrom said that it was clear that a properly constructed scaffold doesn't fall apart. And the fact that a scaffold falls apart raises, you know, a tribal issue of fact about whether it was properly constructed. So the very fact that the scaffold failed and Mr. Thompson fell through the hole is evidence in and of itself of tribal issues of fact of negligence. And then finally, there's a negligence per se because there's a violation of the undisputed violation of the OSHA safety regulations that say that the midrail has to be securely attached and that the stanchions can't be ten feet apart. They have to be no more than eight feet apart. So there's more than just the packstrap or more than just Mr. Farkless's testimony. But I really think that it's clear that the district court went at that declaration with an ax and not a scalpel, and that was inappropriate. That it may be, you know, Mr. Farkless said that the packstrap is slippery, and we haven't relied on that in the brief. I mean, so the court could take that out. I think that probably is a defensible thing to say, but he wasn't a materials expert, and we'll set that aside. But he was very clear in his declaration about what the standard of care, I think it was paragraph 39 of the declaration, which was struck as an improper legal opinion. And in that, Farkless says that the standard of care, the proper way to attach a wooden midrail to a scaffold, is to use metal U-bolts, a metal plate, and locking screws. So that's not a legal opinion. That's a factual opinion by an expert, a safety engineer, about what is required under the statute. And so that was clearly an abuse of discretion from the district court to strike. Farkless also testified, paragraph 26 and 27, said that the use of packstrap was unsafe. Now, he went on and said it was reckless. That's a legal conclusion. That doesn't have to be in there. But he said it was unsafe, and he explained why it was unsafe. Because of the nature of its properties, it was inappropriate that it didn't securely attach the midrail. It wasn't consistent with engineering practices, which the rules require. And so in general, I think that there is – I know that's a tougher road for us, but I think that it was an abuse of discretion to just cut up the declaration quite that way. So issue one is tribal issue of fact about the use of packstrap itself. Then you've got the tribal issue of fact about the spacing of the stanchions. And there was no objection to Farkless's testimony about the NASCO safety manual that said it has to be eight feet apart, about his discussion of the California code of regulations that said they have to be eight feet apart, of the manual for accident prevention by the Associated General Contractors of America, the accident prevention manual from the National Safety Council, the Army Corps of Engineers safety manual. All of these things say the stanchions have to be no more than eight feet apart. Is the theory that if you had the same packstrapping that was used in this case and it was an eight-foot scaffold, it probably wouldn't have prevented the accident. But with a ten-foot scaffold, you would have had to have three supports? That's one theory. If you wanted to have – given the size of it to comply, there would have had to be three supports. And so that way, if one had come untied or loose, you'd still have two others. And the other issue is simply if they were closer together, then the stress would be different and it wouldn't have necessarily put enough stress to stretch out the lashing to the point where the midrail slipped out. In addition, if the stanchions are closer together, then by definition, then you've got more overlap on each side of the stanchion of the midrail. So it's got to move further before it can just fall out. So I think that there are clearly triable issues of facts relating to the spacing of the upright. Negligence per se, there's really no dispute that there was a violation of the rules that say that – the Kalosha regs that say that the midrail has to be securely attached.  And also, again, the attachment using spacing at eight-foot intervals. And essentially, the reciprocal aquiture. I think clearly there are triable issues of fact. NASCO did not negate every possible triable issue of fact about breach. The focus of its argument was duty, was wrong on duty, and the district court should not have dismissed this case on summary judgment. And I'd like to reserve my time. Good morning. John Bandekamp for the appellate NASCO. I know the court will have some questions, but at the outset, I'd like to make three quick points. Under California's workers' comp law, Mr. Thompson, who was severely injured in this situation, received, as of July of 2008, over $900,000 in help, medical assistance, a new home. And indeed, that number, of course, has climbed in the intervening time. Because of California's workers' comp system, the California Supreme Court in the Prevette case made a very important decision and changed the rules with respect to peculiar risk, which at one time used to put some liability on the part of high roars, even in the case where the contractor was negligent and the high roar was not. The what? No longer. What was the noun you used? The what was not? I'm sorry. I missed that. High rollers? High roller. Is that what you're saying? I missed that. What I tried to say is that no longer is there a vicarious liability on the part of the high roar if the contractor is negligent. Higher or. Yeah. H-I-R-O-R. I'm sorry. I thought you were saying high roller like that. I did, too. I was trying to make a hard way 10 or something. Today, the court, after the Prevette case, has issued additional decisions. And in this case, we believe that the McCown case is really the case formula to follow, and that is whether NASCO supplied unsafe equipment to IMIA, that is the scaffold, in a negligent way, in such a way that it affirmatively contributed to Mr. Thompson's injury. That is the proximate cause of his injury. But I think the most important thing I want to leave you with this morning, with respect to the case and the arguments my counsel has made on the left over here, is simply this. There is no evidence in this record that NASCO supplied unsafe equipment, much less equipment, which contributed in a material and affirmative way to Mr. Thompson's injuries. Am I mistaken? Why couldn't the case go to the jury on the theory that NASCO built the scaffolds, NASCO built the wood intake guardrail, and asking the jury, was this unsafe? Well, the evidence, though, is that it was safe when it's turned over. The evidence unanimously indicates that when it was turned over to IMIA a week or two before this accident occurred, that the mid-rail, which is the question here, because it's the mid-rail that slipped in some fashion. What purposes is safe? It might be safe for an hour, but it seems to me using something that stretches doesn't tell you it's safe once it's being used. If something bumps into it, it can stretch. If someone pushes it, it can stretch. Well, the fact of the matter is that... Just a minute. I mean, let me... The fact of the matter is that when NASCO turned it over to IMIA, it had been checked by NASCO... I'm not talking about it was checked. I'm saying it's safe for what purpose? In other words, you're saying... It was safe for its use. It had been determined by not only NASCO at that time, and they green-tagged it at the time, by their wayman who was their expert on this, but it was also checked by IMIA, who then received it and had the safety obligations. You'll tell a jury that it was checked and these people are responsible for it, and someone else will say, yes, it was checked, and it would be fine if it stayed like that. But as soon as somebody pushed on it, it would stretch. And so the jury doesn't have to figure out whether you're tagging it and whether someone inspecting it relieves it or whether just using that material... But the evidence in this case does not assume... Well, you keep interrupting me, and I would like not to be interrupted. I'll try not to interrupt you. But it would seem to me that under that scenario, a jury could conclude that it may well have been safe when inspected for it's secure, but the material itself is something that will become dislodged. And because of that, it wouldn't be a proper material to tie off a handrail, and you would make your argument and they'd make theirs, and the jury would decide that. Let me just make sure that we understand the facts here, because not only did our people inspect it when they put it up and green-tagged it, they turned it over to IMIA for a week to two weeks. IMIA then added to the platform, they built a so-called dog box on top of the platform. This dog box was a mechanism that's sort of like a dog kennel where people could get in and out of the ship, and they would come up the ladder into the platform and then go through the dog box. They built this out and extended it. According to IMIA's people, that is Mr. Thompson's hire, that is the contractor that we hired to do the painting, they built it in such a way that the door kept slamming against the mid-rail, number one. We also know that- What would have happened if it had been secured with bolts and it kept slamming into the mid-rail? What happened if it had a bolt? I don't think there's any evidence that we have one way or the other where it had been bolted, but we do know that pack strap had been used fairly regularly on the premises without any undue or unhappy kind of experiences. There's no showing in this case that pack strap was an improper thing to use. We do know that there was a special tying mechanism that NASCO used when they put it around the upright bolt or the upright post, and we do know that since IMIA had control over that platform for a week or ten days, that it's very possible that they may have retied it. That is, they brought material up, they may have untied it and tried to retie it in such a way that it became unsafe at a later time. We also know that Mr. Pumphrey, the man who built the dog box for IMIA, hired by IMIA, was fired three months later because he had removed a rail and apparently had removed it and then had retied it. They had fired him for that. It was not the scaffold, but it raises a substantial question as to whether or not the negligence of IMIA, not NASCO, was responsible for what happened. Because we can get to the question of the post. As a former prosecutor, I always learned you've got to find out what are the elements of the offense, what's the statute. If you look at every regulation that they throw up here, you will find, if you match it against the evidence, one, that all the people involved in this case said it was securely fastened at the time it was turned over. There's no evidence in the record from any expert that has been admitted into evidence that Packstrap is unreliable for this purpose. They don't make any attempt to try to resurrect their materials expert because he can't be resurrected. And with respect to the, quote, OSHA violations, if you look at what they have claimed to be a violation, 1620, it's inapplicable because this is a metal tubular scaffold. And if you look at the applicable section, one of the provisions says that in a certain type of scaffold, a light-duty scaffold, you can have a 10 feet distance between the upright post. So there's no connection in any way here that they can prove because they have not established that there is any kind of OSHA violation at all. And even so, even if there had been, whether or not it contributed, you know, to the whatever happens here. We do know also that when this was looked at, that is, when the, after the accident occurred, that they looked at the lashings. We'll call them the lashings from the Packstrap after the fact. And there's testimony in the record from Mr. Chavarri and I believe Mr. Diaz that says, no, those lashings do not appear to be tied in the same way that we did under the standardized procedure that we had used, which would give some, I think, relevance to the point that somehow this was changed by IMIA as a superseding cause sometime after it was turned over by NASCO. I think one of the things that seems logical to me is that that argument would be made to a jury because if I was representing the plaintiff, I would say, if they'd used both, like there's a standard in the industry, and you have to untie it, which is not unforeseeable, someone would have to move the rail to do something, that you tie it back up in a bolt, you bolt it back up, and you have the same sort of tying arrangements you had when it was originally made. But if you've got a strap, like you were saying, you have to know exactly how you do it and also use a material that's now been stretched. You don't use a bolt, which is, you know, just common sense. You have to do something different, and it would be foreseeable if somebody would take the rail down and not put it back up properly, whereas if you had a bolted one, it wouldn't take much rocket science to put it back the same way. So it seems to me that that's why I asked for what purpose is it safe. It seems to me the evidence may well be that it was safe at that particular moment, but as soon as it started being used, you could have difficulty. But I think one thing needs to be said. NASCO is the party here. They're obviously trying to get additional liability on the part of NASCO. When it was turned over to IMIA for this period of time, the rules were that they were not to mess around in any way with the scaffold, that if they found any discrepancy, they were reported to NASCO to make the corrections, that they were not to remove the rail, they were not to change the lashings, and apparently there at least is some belief that something like that might have happened. I mean, the reality is we do not know exactly what happened. I mean, I think that's fairly clear from the evidence in this case. But the question is whether or not there should be liability on the part of NASCO, because all the evidence establishes that they were operating under customary procedures, that they were careful in the way that they handled this, and that something happened along the line that changed the situation that led to the terrible injuries that Mr. Thompson sustained. Mr. Thompson himself, by the way, who had not been normally going up to do this kind of work, knew that he was not really supposed to lean against the mid-rail, but did. He had looked at the scaffold, thought it was safe, and he went up there. Apparently it was not. Again, there's nothing in the record that establishes, again, when NASCO turned it over, that it was unsafe. This is a case about evidence, and going through the record of the case back and forth, you will find that there was very good testing by IMIA when they took it over. They moved the mid-rail around right and left, up and down, Mr. Cuba's testimony. Again, there doesn't seem to be any question that this was safe when it was turned over. I'm sorry. It's late in the week. I may have missed this. Could you explain why there was no violation of the 10-foot or whatever is ruled, or the 8 feet between them instead of 10? The record establishes that this was a metal tubular scaffold. According to the testimony of the declaration of Mr. Glade, there's 1644 that applies, which is the OSHA regulation in question. And there are three parts to that at the end. You have a 10-foot distance under one type of scaffold, the light-duty 8 feet for the, I think, the medium and the heavy-duty scaffolds. It's not been established in the record where this fell into which category. Even if it fit into the 8-foot category, there's no establishment of a causation, of an approximate cause with respect to why this lashing fell out of its place. And, again, it's a question of evidence. Affirmative contribution to the injuries through the negligence of NASCO is the test from McCown, and that's what we have to apply here. And that's what the judge below applied. Again, you look at the expert testimony that they tried to put in. Look through their declarations. You get a chance. See what they relied on. Again, Mr. Anderson's testimony has been thrown out. He was the materials person who talked about pack strap. Mr. Farkas tried to rely on his testimony. Did Mr. Anderson talk about friction? Did he do any testing of pack strap? No. Did Mr. Farkas, by the way, who was their other expert, ever see the scaffold? No. He went to the shipyard in August after the March 3rd incident. It was four or five months later. He never saw the scaffold. He does not indicate in any way in his declaration what he relied on. We have no idea what he relied on. He made bold conclusions. Judge Anello is absolutely correct in keeping his testimony out. All right. Thank you, Mr. Anderson. In short, I think it's a question of evidence, and there isn't any. Thank you. Thank you. I think that counsel's argument is established that on duty, there was a duty, and that that's conceded. So the basis for the summary judgment seems to be conceded to be erroneous, and now the question is whether there's some alternative basis to affirm. I think the rest of the argument really — What about the eight and ten-foot? Mr. Vandekamp says that the eight-foot rule applies only to two-thirds of the — well, two categories, and not to the light scaffolding. Is there any evidence as to which type of scaffolding this was? Judge Weiner, I think this is sort of a mixed question of law and fact, and the expert declarations, Farkless declaration, talk about his view of what kind of scaffold and which rules apply. Farkless had his own opinion about which rules would apply, and I don't think that that was fully developed. I mean, NASCO says it's a metal scaffold. The trouble is that it had a wooden rail, so it wasn't fully a metal scaffold, and I don't think either party discussed specifically whether it was a heavy-duty or a light-duty scaffold, so I don't know that that was clear. I hear counsel essentially make two arguments. One is essentially comparative fault, that maybe there are questions about how much NASCO was at fault versus IMIA. And I think if you look at McCown, McCown is very clear that the jury was allowed to make a comparative fault finding between the Wal-Mart, the party who hired the contractor, and the contractor itself. In fact, it was 55 percent of the fault for that accident was attributed to the subcontractor, about 25 percent to Wal-Mart. So the fact that there's potential comparative fault doesn't eliminate all potential liability for breach under McCown. The second argument that Mr. Van de Kamp makes is essentially superseding cause, and he used that term, which is that it's a superseding cause that it's possible that someone changed the lashing. And, you know, Mr. Van de Kamp said he was a prosecutor, I'm a civil attorney, and superseding cause is not available in civil cases when the actual risk. Whose duty is it in summary judgment to show that the lashings were not changed after the scaffold was turned over by the shipbuilder to the subcontractor. The state of the evidence is that Mr. The man who built the scaffold, Cheveria, looked at the photographs that were taken immediately afterward, and his testimony was, I think it's been changed. It's not the same. And then he said, well, I can't really make it out. Mr. Diaz, who was an inspector who green-tagged that scaffold before it was used, looked at it and said, I think it looks the same. And then on follow-up questioning said, well, I'm not sure. And Mr. Deem, who was the safety inspector later who came along and did an investigation, said they could never determine whether they had been changed. So I think that that's a tribal issue of fact at best for NASCO and about whether it had been changed. And I also think that it sort of gets back to the issue of whether it's negligent to tie things to a scaffold. So I think it's foreseeable risk that when things are tied in a way, they can be untied and maybe not put back the way they should have been, particularly with a material that can stretch out of shape, particularly with a situation where there evidently is some very special NASCO way of lashing. And Farkless's testimony was that the standard, the industry standard, to attach a wood mid-rail was using a U-bolt and locking bolts. If that was going to be unbolted, it could be bolted back into place. It would have its same properties and the same strength. NASCO's whole position is it may have been fine when it was turned over, but the problem is it clearly wasn't fine with use. And I think that the jury gets to decide and should decide whether there was a dangerous scaffold or not. I thank you for your attention this morning. Thank you, counsel. Case discharged will be submitted. The court will stand on recess.
judges: Whaley, Nelson D. W., Reinhardt